**BAUSCH & LOMB INCORPORATED, Plaintiff,**

v.

**SONOMED TECHNOLOGY, INC., Louis Katz and Bernard Bressler, Defendants.**

No. CV 87–4011 (ADS).

United States District Court, E.D. New York.

Jan. 3, 1992.

Sacks Montgomery, P.C. (Harry P. Sacks, Jeffrey A. Aronson, Christopher L. Gallinari, of counsel), New York City, for plaintiff.

Bressler, Amery & Rothenberg (Bernard Bressler, David J. Olesker, David A. Miller, of counsel), New York City, for defendants.

## OPINION AND ORDER

SPATT, District Judge.

This case is based on an exclusive distributorship contract involving the manufacture, distribution and sale of ophthalmic diagnostic instruments. During the term of the agreement the distributor claimed a breach of the contract by the manufacturer and then attempted to waive that claim. Among the issues in this interesting contract case is whether the original claim of a breach and the subsequent waiver was pursued in good faith; whether the attempted waiver was legally effective; whether the manufacturer thereafter breached the contract by refusing to deliver further products; and whether the distributor itself repudiated or breached the contract.

## BACKGROUND AND MATERIAL FACTS NOT IN DISPUTE

Defendant Sonomed Technology, Inc., which changed its name to Sonomed Inc. prior to the commencement of this lawsuit (herein referred to as "Sonomed" or "the defendant"), was formed in 1983 to develop, manufacture and market ultrasound devices to be used in instruments for ophthalmologic diagnosis. The instruments are designed to examine and measure the soft tissue structures of the eye, and are known as "A–Scan" and "B–Scan" (herein referred to as the "Products"). The A–Scan is primarily used to measure distances in the eye while the B–Scan gives a two-dimensional image of the eye and is used to locate retinal detachments, tumors and other abnormalities. The A–Scan and B–Scan can be sold and used in combined manner. Bausch & Lomb, Incorporated (herein referred to as "B & L" or "the plaintiff"), is engaged in part in the optical products business including the distribution of ophthalmic devices manufactured by other companies.

On December 21, 1984, Sonomed entered into an agreement with the plaintiff whereby B & L paid to Sonomed the sum of $500,000 as a "prepaid royalty" and became the exclusive world-wide distributor of Sonomed's "A–Scan" and "B–Scan" products for a period of three years. Both the A–Scan and B–Scan products were then under development, and the 1984 agreement was to become effective upon completion of the A–Scan product in 1984. B & L was to begin annual minimum purchases from Sonomed in 1985.

The parties entered into a revised "Distribution Agreement" effective on July 1, 1986 (herein referred to as "the agreement" or "the distribution agreement"), which modified the 1984 agreement in several aspects, including lowering annual minimum purchases, reducing B & L's exclusive right to sell to the fifty states of the United States, Puerto Rico and Canada, extending the contract through December 31, 1989 and requiring that B & L sell a minimum number of units annually in order to retain exclusivity.

The agreement provides that if Sonomed fails to make timely delivery of the products to B & L and fails to cure such default within 90 days after notice, B & L could itself manufacture the products, pay a royalty to Sonomed and B & L would be relieved of its minimum purchase requirements. In that event, the contract would remain in full force and effect in all other material respects. Sonomed was allowed a variance of up to 15% of any purchase order with regard to its delivery obligations.

On November 5, 1987, B & L entered into an agreement with the Cambridge Instrument Company (herein referred to as

"Cambridge"), whereby B & L sold the assets and business of its Optical System Division and its Diagnostic Ophthalmic Instruments business to Cambridge. The Cambridge Agreements included, among other things, the assignment of B & L's rights and obligations under the distribution agreement.

## LITIGATION BACKGROUND

Sonomed commenced an action against B & L on November 9, 1987, in Supreme Court, County of Nassau, based on B & L's alleged repudiation of the 1986 agreement.

On November 30, 1987, B & L commenced this action in the United States District Court alleging antitrust violations based on Sonomed's alleged anticompetitive pricing demands, and also seeking damages for breach of contract. Sonomed discontinued its state-court action, and interposed its breach of contract and fraud claims as counterclaims in this action.

## THE PLEADINGS

The plaintiff's amended complaint consists of three claims. The first claim against all three defendants is in the nature of an antitrust action alleging violation of Section 1 the Sherman Act. The second claim against Sonomed is for damages for breach of the distribution agreement. The third claim against Sonomed is for punitive damages based on Sonomed's intentional acts.

The defendant Sonomed asserted three counterclaims in the answer. The first counterclaim alleges breach of the distribution agreement. The second counterclaim alleges fraudulent inducement of the contract. The third counterclaim also alleges a breach of the distribution agreement.

## PRIOR MOTION BY SONOMED FOR SUMMARY JUDGMENT

In a memorandum and decision dated June 26, 1991, this Court denied the defendant's motion for partial summary judgment on its first counterclaim. In that decision the Court delineated certain triable issues, as follows:

"The Court specifically finds that the agreement is unclear ... as to how inventory is to be allocated with respect to post-default deliveries. Thus, whether Sonomed cured under the terms of the agreement, and whether the cure was timely made within 90 days, requires the resolution of factual issues....

In addition, Sonomed contends that B & L's determination that the default was not timely cured was due to B & L's application of an incorrect accounting procedure. Furthermore, Sonomed states that the application of the correct accounting procedure would demonstrate that the default was cured. However, since the agreement is silent as to what accounting procedure is to be employed by the parties, this determination is also properly left for the trier of the facts.

\* \* \* \* \* \*

Determining whether B & L acted in bad faith in sending the October 23 letter requires resolving subjective issues such as B & L's state of mind, motive and intent. B & L has met its burden of coming forward with specific facts to show that issues of fact exist as to its good faith with respect to the October 23 letter. The affidavits and exhibits with respect to the purchase orders and the memoranda of actual deliveries received support B & L's contentions as to its good faith ... These allegations of good faith are also supported by the October 23 memorandum which appears to acknowledge B & L's belief that Sonomed was in default upon the April 15 notice and had not cured the default within 90 days ... However, the Court considers determinations of such subjective issues, under these circumstances, inappropriate for summary judgment treatment, and a determination by the jury is required. Accordingly, the Court finds that on the issue of B & L's bad faith, there are also raised triable issues of fact."

## THE DISTRIBUTION AGREEMENT

In order to relate the facts that follow to the agreement at issue, the pertinent por-

tions of the Distribution Agreement are set forth as follows:

### A. AS TO THE B & L EXCLUSIVE TERRITORY

"*Section 2.01.* Sonomed hereby appoints B & L to be its exclusive distributor for the Products, Parts and Accessories, throughout the Territory, upon the terms set forth herein. B & L accepts such appointment and agrees to distribute the Products, Parts and Accessories in accordance with those terms.

 \* \* \* \* \* \*

*Section 1.01.* For the purpose of this Agreement, the following terms shall have the following meanings:

 . . . . .

e. 'Territory' shall mean and include the fifty states of the United States, Puerto Rico and Canada."

### B. MINIMUM PURCHASE REQUIREMENTS BY B & L

"*Section 3.02. Minimum Purchase Requirements.* ... B & L shall purchase from Sonomed ... at least the minimum quantities of Products set forth in Table 3.02 for each Quarter provided that such quantities may be reduced pursuant to Section 7.02. Notwithstanding the foregoing, this Section 3.02 shall be deemed fully satisfied and of no further force and effect whatsoever once B & L shall have purchased a total of fourteen hundred and twenty (1420) Products during the Term."

TABLE 3.02

| Quarter Commencing | Minimum Purchase Requirement |
|---|---|
| July 1, 1986 | 85 |
| October 1, 1986 | 85 |
| January 1, 1987 | 114 |
| April 1, 1987 | 114 |
| July 1, 1987 | 134 |
| October 1, 1987 | 134 |
| January 1, 1988 | 94 |
| April 1, 1988 | 94 |
| July 1, 1988 | 94 |
| October 1, 1988 | 94 |
| January 1, 1989 | 94 |
| April 1, 1989 | 94 |
| July 1, 1989 | 95 |
| October 1, 1989 | 95 |
| TOTALS | 1420 |

### C. AS TO B & L's PRICES

"*Article IV*

*Purchase Price of Products*

*Section 4.01.* Sonomed's prices to B & L for all Products shipped during Year 1986 shall be those set forth in Schedule C hereto. B & L shall have sole authority to set its prices to its customers."

### D. LOSS OF EXCLUSIVE TERRITORY IF B & L FAILS TO SELL THRESHOLD QUANTITIES

"*Section 7.02.* In the event B & L fails to sell to end-users the threshold quantities of Products set forth in Table 7.01 ... then this Agreement shall continue in effect but, at Sonomed's option upon 60 days written notice to B & L ... Sonomed may sell and distribute the Products throughout the Territory solely under its own name and/or trademarks."

### E. NOTICE OF TERMINATION AND/OR NOTICE OF BREACH

"*Article VIII*

*Termination*

*Section 8.01.* Unless sooner terminated in a manner provided for herein, this Agreement shall terminate December 31, 1989.

*Section 8.02.* If either party shall be in material breach of its obligations hereunder, the other party may give notice of its intention to terminate this Agreement in addition to any other legal or equitable remedy that may be available to it. This Agreement shall be deemed terminated if within thirty (30) days of receipt of such notice the breaching party shall have failed either to cure such breach or to take diligent steps to cure any such breach not capable of complete cure within thirty (30) days, the substance and timing of which steps have been accepted by the other party."

"*Article X*

*License to Manufacture*

*Section 10.01. Conditional Grant of License.* In the event that Sonomed fails

to deliver Products in accordance with the terms of this Agreement, during the Term, and after notice is unable to cure such failure within ninety (90) days, Sonomed shall be deemed to have granted B & L, as the sole remedy for such failure, a license to manufacture Products and Parts for sale in the Territory by B & L, such license to expire upon termination of this Agreement."

## F. IF B & L OBTAINS RIGHTS TO SELF–MANUFACTURE, ROYALTIES ARE PAYABLE TO SONOMED

"*Section 10.02.* In the event B & L becomes entitled to a license as provided for in Section 10.01, then B & L shall pay Sonomed a royalty of 17.5% of Sonomed's prices to B & L pursuant to Article IV, for each Product sold to an end-user customer, excluding intra-company sales and returns or replacements, with a minimum royalty computed in accordance with the minimum purchase requirements of Section 3.02."

## G. B & L's RIGHT TO ASSIGN OR TRANSFER TO A SUCCESSOR

"*Section 12.08.* Neither party shall have the right to assign or transfer all or any portion of its rights or obligations hereunder (except as expressly provided in Section 10.01) without the prior written consent of the other party provided B & L may make an assignment or transfer to a B & L affiliate or to a successor to B & L's ophthalmic instrument business which has acquired the assets of such business from it. B & L shall guarantee any obligations of its corporate affiliates which arise under this Agreement."

## THE TRIAL

This opinion and order disposing of this action includes the Court's findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a) (*see also Colonial Exchange Ltd. Partnership v. Continental Casualty*, 923 F.2d 257, 257 [2d Cir.1991]).

The Court will now review the significant trial testimony and exhibits. During this discussion the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

During the trial, there has been extensive testimony taken and voluminous exhibits introduced. Much of the evidence concerned the issues of whether there was a default in delivery by Sonomed prior to April 15, 1987; whether Sonomed cured the default within the ninety-day period; and whether B & L acted in "good faith" with regard to the alleged default, cure and its notice to self-manufacture. The Court finds, however, that the crucial issues in this case are clear and can be substantially determined on the uncontroverted documentary evidence in the case.

The threshold significant document is, of course, the distribution agreement effective July 1, 1986 (Plf's Ex. 6), portions of which have already been referred to by the Court.

The next important document is a letter written by David A. Souerwine, Vice President of B & L to Louis Katz, President of Sonomed, on April 15, 1987 (Plf's Ex. 26). In this letter B & L complained of (1) quality problems in the Sonomed products, and (2) a failure to deliver according to the terms of the agreement. The April 15, 1987 "default" letter stated in part, as follows:

"Breakdowns have occurred in over 35% of the units we have delivered (approximately 70 out of 200). We have been able to remedy most of these problems without undue inconvenience to the customer, but a failure rate of this magnitude is unacceptable to me and B & L.

\* \* \* \* \* \*

The issue of B–Scan problem leaks is potentially much more damaging.

\* \* \* \* \* \*

We will not accept any future shipments of B–Scans until we receive your letter clarifying the corrective measures taken and assuring B & L that the problem has been solved. Likewise, no B–Scans will be shipped by B & L to accounts until this has taken place. Needless to say, this is untimely for both of us since Sonomed is already behind in delivery of

B–Scans while we have orders inhouse which must be filled. Lost sales opportunities that result are costly in an ultrasound market that has limited opportunities and intense competition.

Addressing the delivery issue for a moment, I have attached a schedule of product delivered versus our orders. This letter also serves as formal notice to Sonomed of your failure to deliver according to the terms of the July 1, 1986 Agreement per the terms of Section 10.-01, you have 90 days to cure such failure."

The effect of the April 15, 1987, was, in part, to trigger Section 10.01 of the agreement, which provides that in the event of a failure by Sonomed to timely deliver, B & L can give a ninety-day notice. If the delivery shortfall is not cured within the ninety-day period, the Agreement provides that B & L can self-manufacture the products, continue the agreement and pay royalties to Sonomed.

The Court notes that B & L had in-house manufacturing capability and was already manufacturing lasers, ophthalmic surgical products and other similar equipment.

After receipt of the April 15, 1987 "default" letter, the defendant Sonomed conceded that it did not comply with the delivery requirements. The third key document is the reply letter from President Katz, to Souerwine, dated May 14, 1987 (Plf's Ex. 31), which provides, in part, as follows:

"Dear Dave:

I have waited this long to respond to your letter dated April 15, 1986 in order that I may do a thorough investigation of the issues you raise concerning delivery and service problems with our ultrasound equipment. I have also waited for an updated service list from Bob Coviello which I just received yesterday during his visit to our facilities. Based on the information I have gathered, I would like to respond with some facts on the service records of the A and B–Scan and the problems with the B–Scan handpiece we are now encountering.

\* \* \* \* \* \*

2. *Breakdown and Service of the B–Scans*

The B–Scan system can be divided into two separate components, the electronic unit and the scanning handpiece. The B–Scan electronic units have had almost no problems at all. To date we have received and serviced only two units out of 57 units shipped to you (including the 3rd quarter of 1986). Considering that B–Scan is a new product, that is an excellent record.

On the other hand, the scanning handpieces have had excessive problems of fluid leaks and in some cases membrane breaks. I only know of one case where the front membrane loosened while in use. That, I must admit is a rate of failure which is unacceptable. I would like to outline the cause of the problem and the remedial steps we have taken to correct it.

\* \* \* \* \* \*

3. *Deliveries and Backorders*

According to our records, deliveries and orders of A and B–scan units for the 4th quarter 1986 and First quarter 1987 are as shown on the accompanying sheet. As you see we are on schedule with both A–1000 and A–2000 systems and *are in a backorder situation with B–Scans, being behind 47 units. We hope to work off this backlog within the next several months.*

\* \* \* \* \* \*

At this point the crucial question to us is when can we resume deliveries of the B–Scan. We feel confident that the remedies I outlined will work. It is up to you now to affect speedy testing in your facilities of the units which we will ship to you. Once you approve, I would like to have immediate access to the list of users who will be receiving subsequent units so that we can monitor closely their performance, durability and usage. I would *presume that if all goes well under these pilot conditions, we should be able to work off the entire backlog within three months of approval and release of shipments to you*" (emphasis supplied).

Sonomed annexed a table of shipments to the May 14, 1987 response letter which expressly stated that there was a shortfall in shipments of B–Scans for the fourth quarter of 1986 of 21 units, and a shortfall in delivery for the first quarter of 1987 of 28 units, for a total shortfall of 49 units.

Between May 14, 1987 and October 23, 1987, there were negotiations, including phone calls and a meeting, between the parties relating to their status. Also, there were conferences and the exchange of memoranda between the B & L personnel in charge of the ultrasound products relating to the default and whether there was a cure.

The Court finds that B & L attempted to ascertain the accurate facts regarding the defendant's default in timely delivering the products and whether there was a timely cure. A number of exhibits were introduced which showed that during this period accountings were made which demonstrated a delivery default and no cure (*see for example* Plf's Exs. 53, 56, 65 and 69).

Meetings were held between Alexander Russell, an Executive Vice President of B & L, who took over the Ophthalmic Instruments Division and David Dallam and Jay Wisenauer, in early September 1987 to discuss whether the delivery default had been cured by Sonomed. Another meeting was held by Russell, Dallam and finance department people on October 12, 1987 on the same subject. On October 16, 1987, Russell met with B & L attorneys Carl Steinbrenner and Robert Stiles regarding the delivery default. On October 20, 1987, another meeting was held on the same subject. On October 21, 1987 Russell met with the Management Executive Committee ("MEC") and the Chairman of the company, Daniel Gill, who was assured by Russell that there had been a delivery default and that it was not cured. After these series of intercompany meetings and a review of the purchase and delivery records, B & L's house attorneys concluded that the delivery default was not cured. Chairman Gill was so advised.

Based on all the internal meetings, the records of the deliveries then known at that time, and the advice of the B & L chief counsel Stephen Hellrung, Chairman Gill authorized the sending of a letter opting to exercise B & L's right to self-manufacture and pay Sonomed royalties, under the provisions of Section 10.01 of the agreement. This important provision is restated now as follows:

*"Article X*

*License to manufacture*

*Section 10.01. Conditional Grant of License.* In the event that Sonomed fails to deliver Products in accordance with the terms of this Agreement, during the Term, and after notice is unable to cure such failure within ninety (90) days, Sonomed shall be deemed to have granted to B & L, as the sole remedy for such failure, a license to manufacture Products and Parts for sale in the Territory by B & L, such license to expire upon termination of this Agreement."

The Court notes that during the period between April 15, 1987 and October 23, 1987, B & L received no written communication from Sonomed either denying that there was a default or claiming that the default had been cured.

The fourth significant document is the October 23, 1987 letter sent by Russell of B & L to President Katz, of Sonomed (Plf's Ex. 60), which stated, in part, as follows:

"As you are aware, by letter of April 15, 1987 Bausch & Lomb formally notified Sonomed that Sonomed was in material breach of its obligations under section 3.01 of the July 1, 1986 Distribution Agreement between our two companies in that Sonomed had failed to make timely deliveries under Bausch & Lomb's purchase orders accepted by Sonomed pursuant to that section. You were advised in that letter than [sic] Sonomed's inability to cure such failure within 90 days would constitute the granting of a license to Bausch & Lomb pursuant to Section 10.01 of the Agreement under which we could manufacture the A–Scan and B–Scan and components thereof for sale in the United States, Puerto Rico

and Canada for the duration of the Agreement.

Your failure to cure within 90 days automatically caused the Section 10.01 license to be granted which in turn terminated Bausch & Lomb's obligation to purchase A–Scans and B–Scans from Sonomed under the minimum purchase requirements of Section 3.02. Correspondingly, the obligation of Bausch & Lomb to furnish Sonomed any further purchase order/forecast under Section 3.01 of the Agreement was also terminated by such action.

Thus, as of July 15, 1987, Bausch & Lomb has no longer been obligated to purchase any further product from Sonomed in accordance with the terms of the Agreement we reached last year. You can be assured that Bausch & Lomb will continue to endeavor to advertise, market, and sell the A–Scan and B–Scan in the United States, Canada and Puerto Rico in *accordance with the provisions of the Agreement.* In light of the exclusivity requirements of Section 7.01, we also plan on employing aggressive marketing techniques and pricing strategies to attempt to sell the necessary number of A–Scans and B–Scans to end-user customers" (emphasis supplied).

This letter was intended to trigger the self-manufacturing right contained in Section 10.01 of the agreement. Crucial to the Court's determination, is that under this provision, the agreement would not terminate but would continue in effect in that B & L would manufacture the units itself and pay royalties to Sonomed. All of this was expressly permitted under the terms of the agreement.

On November 2, 1987, Russell and Steinbrenner met with Bernard Bressler, Esq., President Katz and William Eaton, a Vice President of Sonomed. The Court notes that Attorney Bernard Bressler, and/or his law firm, was, and still is General Counsel to Sonomed. Also, Attorney Bressler is Secretary, a member of the Board of Directors and a 1 and 1/2% stockholder of Sonomed. In addition, Bressler's law firm has a one-third contingent fee dependent upon the result of the counterclaims in this lawsuit. Although in the strange position of being a material witness and a participating trial lawyer (*see* Code of Professional Responsibility DR 5–101; 5–102), the parties stipulated to permit this dual capacity by Attorney Bressler.

At the November 2nd meeting, Attorney Bressler insisted that Sonomed was not in default and certain proposals were made to settle the matter and/or terminate the distribution agreement. At this meeting, President Katz presented the Sonomed people with the Sonomed invoice records purporting to demonstrate a cure of the default.

In the meantime, B & L was negotiating to sell its entire Optical System Division and its Diagnostic Ophthalmic Instruments business, including its rights under the Sonomed agreement and the ultrasound products, to the Cambridge Instrument Company (herein referred to as "Cambridge"). The contract to sell these assets was executed on November 5, 1987 and the transaction closed on December 9, 1987.

As noted previously, the distribution agreement permitted B & L to assign or transfer its rights and obligations under the distribution agreement "to a successor to B & L's ophthalmic instrument business which has acquired the assets of such business from it." The Court finds that B & L could, and did, properly assign its rights under the distribution agreement to Cambridge, which company "acquired the assets of such business from it."

In the fifth important document, on November 3, 1987, Attorney Bressler wrote a six-page letter to B & L (Plf's Ex. 66), stating that (1) the agreement remains in full force and effect "except to the extent you have repudiated it," (2) any alleged default by Sonomed has no legal effect because the delivery default was cured within ninety days after the receipt of the April 15, 1987 default letter, (3) until the October 23, 1987 "self-manufacture" letter, Sonomed was not advised that B & L considered the default to be uncured, and (4) unless the B & L purchase order for the quarter ended September 30 is received

within thirty days, Sonomed will terminate the agreement.

In addition, the November 3, 1987 letter contained the following language:

"You have advised us, first in your letter of October 23, and then at the meeting of November 2 in our office, that you do not intend to purchase any Product under the Agreement. This constitutes an anticipatory breach and repudiation of the Agreement. Accordingly, we require assurance that you will comply with your purchase obligations. *In light of the fact that your letter and repudiation came to Sonomed within one week of the Academy meeting which is the critical selling period, we require assurance of you willingness to live up to all the terms of the Agreement by 1:00 P.M., Friday, November 6.* If we do not hear from you *affirmatively* by telecopy to this office, we will assume that you are continuing to repudiate the Agreement.

If you choose to continue to repudiate the Agreement, we will, of course, seek such legal recourse as we deem advisable. In addition, we will commence to market Products manufactured by us in both the territory provided for in your letter of September 16, 1987, referenced above, and throughout the rest of the territory under the Agreement. *Your decision to advise us, one week before the Academy meeting, of your repudiation of your obligations does not afford us the luxury of waiting 30 days while you reconsider your ill-advised decision.* We must continue in business and defend our right to do so" (emphasis supplied).

The Court finds that there was no contractual basis for this self-imposed 48-hour notice by Sonomed. In fact, the only pertinent notice provisions in the agreement were a ninety-day cure period in the event of a delivery default (Section 10.01) and an apparently optional thirty-day notice in the event of any other material breach (Section 8.02). The Court will discuss the applicable UCC provisions and the repudiation issue later in this opinion.

Receipt of the Bressler November 3, 1987 forty-eight hour ultimatum put the pressure on B & L. At a Friday, November 6, 1987 meeting, Chairman Gill directed that a complete inventory be done and, for the first time, it was realized by the executives of B & L that some of the ultrasound units had been cannibalized in order to send out parts to replace defective parts in units that had been sold.

A meeting was held in Dallas at the Academy of Ophthalmology convention on November 11, 1987 between Chairman Gill and President Katz. There was no resolution of the problems between the companies.

Additional pressure was to be applied to B & L. On November 9, 1987 a summons and complaint in a Supreme Court Nassau County action by Sonomed was received by B & L. Additional reviews of the B & L purchase and delivery records were ordered and made. Executive personnel made a review of each purchase order and delivery invoice. It was determined at that time that the B & L records were "a total mess," drop shipments (direct shipments to customers) and phoned orders were difficult to calculate and products returned to Sonomed for repairs and re-delivered to B & L caused confusion. It was then decided by the top B & L personnel that no "clear" failure to cure the default could be made out by their records.

To add to the confusion, with regard to the issue of whether there was a cure, not only were the B & L records in poor shape; not only were there special problems like "drop shipment" deliveries direct to customers and telephoned special orders not formalized by regular purchase orders, but even Sonomed apparently did not carefully record its own records so as to determine whether it had cured the default. President Katz testified as follows on direct examination:

"Q Mr. Katz, I asked you, did you then track shipments to determine whether or not you had cured the default?

A Well, not to any great specific—not to a great specificity.

I have my invoice book always in my hand. It is right below my desk and the ledger. And I see pretty much everything everyday. And I know pretty much what we shipped." (Tr. at p. 2013).

President Katz further testified on this subject on cross-examination:

"Q Mr. Katz, let's talk a little about the calculation of the default and the cure of the default.

You were the person at Sonomed most involved with calculating the default and the cure of the default; is that correct?

A Yes.

Q And your calculations included the May 14th letter and the chart attached to it? That was your first calculation; is that correct?

A No.

Q Let's put it this way, you served the May 14th letter and the chart attached to it; is that correct?

A Yes.

Q And you testified the next time you did a detailed conversation was in August after your phone conversation with Mr. Dallam or Wisenauer setting up the September meeting; is that correct?

A Yes.

Q And in fact, the next calculation you did came in October, after you got the October 23 letter; is that correct?

A Yes." (Tr. at pp. 2087, 2088).

The Court further notes that at no time did Sonomed ever write a letter to B & L stating that it had cured the delivery default.

On November 12, 1987, B & L General Counsel Stephen A. Hellrung met with Attorney Steinbrenner after the detailed record review was concluded. He was advised of the problem with the records; and that because of the condition of the records, no "clear" failure to cure the default could be established. On November 13, 1987 General Counsel Hellrung met with Chairman Gill to advise him the records were confused, "cast a shadow over our calculations" and that it would be difficult to prove a failure to cure the default with any certainty.

It was then decided at the highest level of B & L to withdraw the October 23, 1987 "self-manufacture" letter, waive any delivery default, implicitly waive any demand to self-manufacture under Section 10.02 and adhere in full to the "non-self-manufacture" provisions in the distribution agreement. Chairman Gill immediately called President Katz to advise him that B & L was going to waive any default and its right to self-manufacture and would proceed with the agreement as before. These expressions were set forth in the sixth significant document, a letter from Chairman Gill of B & L to President Katz of Sonomed, dated November 17, 1987 (Plf's Ex. 86), which reads in full as follows:

"Dear Lou:

As I informed you by telephone this morning, we are hereby withdrawing our letter of October 23, 1987 which is the source of the present controversy between our companies and will continue to purchase product from Sonomed in accordance with the minimum purchase requirements of Section 3.02 of the Distribution Agreement dated July 1, 1986.

In that regard, Bausch & Lomb's purchase order/forecast for the fourth quarter of 1987 is enclosed which includes Bausch & Lomb's firm purchase order for the fourth quarter of 1987 and first quarter of 1988. These purchase obligations are in addition to the 25 units (4 A-1000's, 3 A-2000's and 18 B-scans) which are still to be filled for the third quarter of 1987.

Bausch & Lomb has always complied fully with its obligations under the Agreement and will continue to make every effort to do so. I am hopeful that our present position will serve to re-establish a working relationship between Bausch & Lomb and Sonomed and that the remainder of the Agreement can be administered and performed by both of our companies to our mutual benefit.

I look forward to hearing from you on this matter tomorrow morning.

Sincerely,

Daniel E. Gill" (signature).

Annexed to the November 17, 1987 "waiver" letter was the B & L "Fourth Quarter 1987 ultrasound purchase order/forecast" which also included the forecast for the first, second and third quarters of 1988.

President Katz agreed, that after receiving the November 17, 1987 "waiver" letter, Sonomed could have continued to do business under the agreement.

"Q After you got Exhibit 86 the November 17th letter, it's correct that Sonomed had the option at that point to continue on with the distribution agreement now that the October 23 letter had been withdrawn, to sell the full quantities set forth as purchase minimums in that letter to either B & L or Cambridge, and to compete with B & L or Cambridge in 1988 in the event that B & L and Cambridge didn't meet the minimum sales requirements, correct?

A With respect to those statements, yes.

\* \* \* \* \* \*

Q Mr. Katz, as of November 17th Sonomed had the ability to continue on with the agreement and to sell full quantities to B & L and Cambridge and possibly compete if the sales minimums weren't met, correct?

A With respect to that statement, yes." (Tr. at pp. 2205, 2206).

At this point, the Court finds that the parties were back to the pre-April 15, 1987 status. There was no B & L claim of breach by Sonomed. Nor was there any breach by B & L. Further, the Court finds that the April 15, 1987 default letter and the October 23, 1987 "self-manufacture" letter were both written in "good faith." The mixed question of law and fact involved in the issue of good faith will be further discussed in the "conclusions of law" section of this opinion (*see infra*). The factual issues bearing on the good faith issue will now be reviewed.

The B & L records available at that time, poor shape or not, indicated a failure to timely deliver on Sonomed's part. In addition, there is evidence that some of the B–Scans were defective. Crucial to the

Court's determination of B & L good faith as to the initial delivery default is the Sonomed admission in its letter of May 14, 1987, in which President Katz stated:

"As you can see we are on schedule with both A–1000 and A–2000 systems and are in a backorder situation with B–Scans, being behind forty-seven units. We hope to work off this backlog within the next several months."

Further, there is substantial evidence that Sonomed did not cure the default. The delivery default at issue in the April 15, 1987 letter concerns the fourth quarter of 1986 and the first quarter of 1987. Sonomed contends that the delivery default was cured within the required ninety-day period by deliveries made subsequent to the end of the first quarter of 1987 and prior to the ninety-day period set forth in the April 15, 1987 default letter.

The method to account for the subsequent deliveries with regard to a cure of a prior delivery default was not set forth in the agreement and is properly the subject of extrinsic evidence (*see Bausch & Lomb Inc. v. Sonomed Tech., Inc.* No. CV–87–4011, slip op. [E.D.N.Y. June 26, 1991]).

As to the method of calculating the subsequent deliveries, vis-a-vis a cure of the delivery default, Sonomed contends that the deliveries in the second quarter of 1987 should first be "carried back" so as to cure the prior default in 1986 and the first quarter of 1987, even through the deliveries are in response to purchase orders rendered in the second quarter of 1987 and the deliveries were actually made in the said second quarter of 1987.

There is an obvious logical fallacy in such a method of calculation. For example, if the purchase orders for the second quarter of 1987 were ten B–Scans and the deliveries made in that quarter were fifteen B–Scans, which were all "carried back" to the prior default period, this would cause another default, this time for the second quarter of 1987. With reasonable certainty, this process would cause a self-perpetuating continuous default, possibly for the entire term of the agreement.

Moreover, there is clear documentary evidence that President Katz of Sonomed, himself calculated the second quarter of 1987 deliveries by crediting the delivery of the actual quarter of order and delivery rather than "carrying-back" the delivery to the prior default period.

Annexed to the Sonomed May 14, 1987 reply letter (Plf's Ex. 31) is a sheet, annexed by Sonomed, showing the orders and deliveries of the B–Scans for the fourth quarter of 1986 and the first quarter of 1987, as follows:

"4TH QUARTER–1986 AND 1ST QUARTER–1987 SHIPMENTS TO B & L"

| | B-3000 |
|---|---|
| 4TH QUARTER—1986 | |
| (B & L ORDER) | (48) |
| SHIPMENTS | 30 |
| 1ST QUARTER—1985 | (44) |
| SHIPMENTS | 15 |
| TOTAL SHORTFALL (or excess) in shipments 4th & 1st Quarters" | 47 |

This record annexed by Sonomed President Katz to his May 14, 1987 letter is strong evidence that, as of that time, Sonomed was in delivery default pursuant to section 3.01 of the distribution agreement, calling for "a variance of up to 15% on the actual quantity of ... B–Scans delivered to B & L from those quantities specified in each particular order transmitted to Sonomed." Simple arithmetical computation reveals that a shortfall of 18 products out of 48 ordered in the fourth quarter of 1986, and a shortfall of 29 products out of 44 ordered in the first quarter of 1987, is more than a 15% variance in both quarters.

Further, there is documentary evidence that even President Katz of Sonomed calculated the 1987 second quarter deliveries without a "carry-back" to the prior quarters in which the default occurred. Plaintiff's Exhibit 145, the seventh significant document, consists of fourteen pages of handwritten notes by President Katz. Page four of this exhibit is a photostatic copy of the identical "Shipments to B & L" sheet annexed to the Sonomed letter of May 15, 1987. However, on this sheet, below the typed figures repeated here, are handwritten notes by President Katz as follows: (Typed portion annexed to Sonomed May 14, 1987 letter [Plf's Ex. 31]):

"4TH QUARTER–1986 AND 1ST QUARTER–1987 SHIPMENTS TO B & L"

| | B-3000 |
|---|---|
| 4TH QUARTER—1986 | |
| (B & L ORDER) | (48) |
| SHIPMENTS | 30 |
| 1ST QUARTER—1985 (sic) | (44) |
| SHIPMENTS | 15 |
| TOTAL SHORTFALL (or excess) in shipments 4th & 1st Quarters" | 47 |

Handwritten portion (Plf's Ex. 145 at p. 4).

| | "B-3000 |
|---|---|
| 2D QUARTER—1987 | |
| (B & L ORDER) | (24) |
| SHIPMENTS | 34 |
| BALANCE | 37" |

Clearly, President Katz in the computation in his own handwriting allocated the 34 units shipped in the second quarter of 1987 first to the purchase order in that quarter of 24 units and only after such deduction, did he "carry back" the balance of 10 units to the prior first quarter of 1987 default period and then reduced the 47 count shortfall by 10 to a total shortfall of 37.

Thus, even though the B & L records were in an unclear state with regard to conclusive proof that there was no cure of the delivery default, the combination of whatever records the plaintiff had, which records showed a failure to cure the default—, the defendant's admission of a delivery default of 47 units, the defendant's own calculation not using the "carry back" method, establishes not only the likelihood of a failure to cure the delivery default but also supports a finding of good faith on the part of B & L.

Also, in its May 14, 1987 reply letter, Sonomed conceded that there were quality problems with the B–Scans, as follows:

"2. *Breakdown and Service of the B–Scans*

\* \* \* \* \* \*

On the other hand, the scanning handpieces have had excessive problems of fluid leaks and in some cases membrane breaks. I only know of one case where the front membrane loosened while in use. That, I must admit is a rate of failures (sic) which is unacceptable. I would like to outline the cause of the

problem and the remedial steps we have taken to correct it."

This further indicates that the April 15, 1987 default letter was sent "in good faith."

Turning to the plaintiff's second claim of breach of contract, B & L contends that Sonomed made sales within its exclusive territory of the fifty states of the United States, Puerto Rico and Canada. David Dallam, then a B & L Vice President of Marketing, testified that he was not aware of any such sales until he discovered them at the Academy Meeting in Dallas on November 8, 1987. There is substantial documentary evidence which establishes the Sonomed sales in the B & L exclusive territory. Plaintiff's Exhibit 162 consists of seventy-five Sonomed invoices recording such sales. The dates of these invoices commence on July 21, 1986 and continue to December 17, 1987.

In addition, on the stand, both Sonomed Vice President Eaton and President Katz conceded that such sales in the B & L "exclusive" territory were made.

Eaton testified that Sonomed hired a distributor in Canada on September 22, 1987 (*see* Plf's Ex. 51). In addition, Eaton testified at length regarding Sonomed sales in the B & L exclusive territory. Some of this testimony is as follows:

"Q And, sir, you knew in fact that Sonomed had been doing sales in the eastern part of the U.S. for quite sometime, did you not?

A We've made some sales, yes.

Q And you knew that those sales were not authorized by the Bausch & Lomb/Sonomed agreement; is that correct?

A By the agreement they were not authorized.

Q In fact, you never told Centurion Scientific in late October or early November that Puerto Rico was in Bausch & Lomb's territory, correct?

A Correct.

Q In fact, you hired Centurion Scientific to be the distributor in Puerto Rico; is that correct?

A I did.

Q You never told anyone at Bausch & Lomb that you had done that, did you?

A No.

Q You never told at Bausch & Lomb that you had even spoken to Mr. Ruiz about hiring a Puerto Rican distributor for the product, did you?

A Correct.

Q In fact no one from Sonomed, to your knowledge, ever told Bausch & Lomb that a Puerto Rican distributor had been hired starting with discussions on October 30, 1987, correct?

A That's correct.

Q In fact, sir, in the summer and fall of 1987 you went ahead on behalf of Sonomed and set up a sales force in the northeast United States, correct?

A We set up a sales force, began to, yes." (Tr. at pp. 1325, 1326).

\* \* \* \* \* \*

"Q Prior to the September meeting was it your understanding, Mr. Eaton, that it was perfectly permissible for Sonomed to sell in the northeast?

A Yes.

Q And was it also your understanding that it was permissible for Sonomed to sell in the northeast at any time during that distribution agreement which began as of July 1, 1986?

MR. OLESKER: Your Honor, I object because I don't understand the question.

THE COURT: Do you understand the questions?

THE WITNESS: I do. And the answer to that is: Yes." (Tr. at p. 1440).

\* \* \* \* \* \*

"Q Do you know, sir, of any instance where Sonomed gave B & L credit for a sale?

A No.

Q Do you know, sir, of any instance where Sonomed told B & L that it was making this sale?

A Not specifically, no." (Tr. at p. 1441).

Also, Attorney Bressler testified as to these prohibited sales, as follows:

"Q Yes.

Is it correct that you do not have a present recollection of any discussions between B & L and Sonomed with regard to sales made by Sonomed in the territory of the United States, Puerto Rico or Canada prior to November three, 1987?

A I can't answer that question yes or no.

Q Well, do you have any knowledge—do you have any knowledge with respect to those sales, any such sales?

A I know that sales were made now. I now know that sales were made, yes.

Q And am I correct that in connection with this trial within the past month in computing Sonomed's claimed damages in this case, Sonomed is—has listed a certain credit to B & L for these sales? And I am talking about the sales that B & L calls secret or surreptitious sales.

A I understand what you are saying, Mr. Sacks, Yes.

I have not looked at the damage calculation in a few weeks or months. And if you say that's correct, then that is correct." (Tr. at pp. 1890, 1891).

President Katz also conceded that Sonomed sold products in B & L's exclusive territory during the term of the agreement and did not compensate B & L.

"Q My question is: Under the 1986 contract you never credited B & L with any commissions, did you?

A That is correct.

Q Now, in fact, until November 6, 1991—slightly more than a month ago, when Sonomed amended its damage statement in this case, there never was a credit given to B & L for sales in the territory of any sort, correct?

A Correct.

Q But you now would acknowledge, would you not, that you owe money to B & L in connection with the sales of the territory, correct?

A I do.

Q How much, Mr. Katz?

A I don't have an exact number. My estimate would be somewhere between ten and $15,000." (Tr. at pp. 2187, 2188).

Further, there is evidence that, after the handpiece on the B–Scans were corrected, subsequent to the May 14, 1987 reply letter, B & L notified Sonomed it could resume shipping B–Scans and Sonomed continued to ship to B & L (*see* deposition of Wisenauer Tr. at p. 1458). In this regard I refer in part to the testimony of President Katz:

"Q And did there come a time—withdrawn.

Mr. Katz, what happened after this, with regard to this letter?

A Well, after this September 16th, 1987 letter, that's the date of this letter, we heard nothing more about this subject. The next thing we got was the October 23 letter declaring a non-cure for the default, and their claim to self-manufacture.

Q Did you have any communication with anybody at Bausch & Lomb between October 23 and September 16th with regard to the subject matter of the September 16th letter?

A No.

Q Mr. Katz, after you got the September 16th letter, did Bausch & Lomb continue to take goods from you?

A Yes.

Q Mr. Katz, during the life of the contract—withdrawn.

Did Bausch & Lomb ever purchase more than the minimum quantities required by the contract to be purchased in any year during the life of the contract?

\* \* \* \* \* \*

A No." (Tr. at pp. 2027, 2028).

The Court finds that B & L never violated or abandoned its obligations under the agreement to purchase products from Sonomed.

Attorney Bernard Bressler testified in support of Sonomed. The Court refers to a portion of this testimony on the issue of whether Sonomed cured the delivery default within the required ninety-day period, as follows:

"Q Mr. Bressler, if your interpretation of this contract at issue is correct, and I am not arguing with you now whether it

is or it is not correct. I am trying to put a bright light on this issue.

If your interpretation of the contract is right then as of the end of June of 1987 Sonomed would have cured the default for the first quarter of 1987 and the fourth quarter of 1986; is that correct?

A That's correct.

Q And they would have been—would have done that because 30 B–Scans would have come in during the period after April 1, 1987 through the end of June of '87?

A That is correct.

Q Okay.

What I am saying is that a contrary interpretation—strike that.

If your interpretation is correct as of that date when you got that 30th B–Scan that satisfied that cure, would have been at the end of June and B & L would have received zero B–Scans for its outstanding order for the second quarter of 1987; is that correct?

A I said yes to that before.

Q Okay.

If your interpretation is correct, then it just continues through the entire line of the contract up to the end of 1989?

A Mr. Sacks, the answer is that it could.

Q Okay.

Yet you think the more reasonable way *of doing it is the way you did it as an* accounting method, and that is that you don't' satisfy the current quarter, you satisfy the cure; is that correct?

A I cannot answer that yes or no."

\* \* \* \* \* \*

"Q The answer is the same, if you credit every delivery to the cure, whether you use April 15th or you use May 14th, if you don't have to satisfy second quarter of '87 and third quarter of '87 requirements, by July 15th there is a cure?

A Yes.

Q And if you do have to satisfy the current quarters, whether you use the April 15th schedule, whether you use the May 14th schedule, *it doesn't make a*

*difference and there is no cure;* is that correct?

A That's correct" (emphasis supplied) (Tr. at pp. 1847, 1848 and 1853).

Further, President Katz could not·say that there was a cure, unless the "carry-back" method of calculation was used. In this regard, he testified as follows:

"THE COURT: Yes. Motion granted. You heard the question now posed twice.

Assuming all the deliveries in the second quarter of 1987 from Sonomed to Bausch & Lomb are attributed to the purchase order for the same quarter, the second quarter of 1987. Assume for the purpose of this question that that is so. Then the question to you is: Then the prior default would not be cured; is that correct?

THE WITNESS: I really don't know. I have to do the calculation to see how many units there were and so forth." (Tr. at p. 2099).

If the "carry-back" method of calculating the cure was not used and if the deliveries were attributed first to the purchase order for the quarter delivered, the Court finds that there would be no cure to the delivery default.

In this regard, the Court finds that B & L could properly credit the post-default deliveries to the quarter ordered and received. It did not have to first "carry-back" such subsequent deliveries to the prior delivery default period. Under this method, which the Court finds to be fair, Sonomed had to satisfy every current purchase order. If there is a surplus number of products delivered, only such surplus products would be "carried back". This is a reasonable and fair calculation and certainly cannot form the basis for a charge of "bad faith" by B & L.

This brings the Court to the most significant document in this tangled breach of contract action and counterclaim, the Attorney Bressler's November 19, 1987 letter. Let me set the factual stage:

(1) On April 15, 1987 B & L sent a letter of default to Sonomed essentially claiming two types of default (a) failure to timely

deliver at least 85% of its purchase orders for the fourth quarter of 1986 and the first quarter of 1987; and (b) complaining of the poor quality of the B–Scans.

(2) On May 14, 1987, prior to litigation, President Katz wrote to B & L and acknowledged Sonomed's default in timely delivering with a conceded shortfall of 47 B–Scan units; namely, shipment of only 30 out of 48 units in the fourth quarter of 1986 and shipment of only 15 units of 44 in the first quarter of 1987. Katz also acknowledged that there was a problem with the B–Scan handpieces.

(3) The April 15, 1987 default letter provided for a ninety-day cure period as per Section 10.01 of the agreement. This time period expired no later than July 17, 1987.

(4) There was no written notice sent by Sonomed to B & L claiming a cure of the delivery default.

(5) Subsequent to July 17, 1987 there were discussions between Sonomed and B & L during which each side adhered to its respective position as to the cure of the default.

(6) On October 23, 1987, acting pursuant to Section 10.01 of the agreement and the alleged failure to cure the delivery default, B & L opted to choose to self-manufacture and continued the agreement by the payment of royalties to Sonomed.

(7) The parties then met again in an attempt to resolve their disagreements, without success.

(8) On November 3, 1987, attorney Bressler wrote to B & L advising them that there was no delivery default by Sonomed and gave B & L until November 6, 1987 at 1:00 p.m. to withdraw their October 23rd letter.

(9) This move precipitated a detailed and intense audit by B & L of their purchase orders and delivery records, and the inventory, together with a series of expedited meetings of B & L top personnel.

(10) Finding their delivery records in an inadequate and unclear state, B & L decided to withdraw their claim of delivery default, withdraw their October 23rd election to self-manufacture and agree to continue

to do business, as before, under the non "self-manufacture" terms of the distribution agreement. B & L clearly communicated all of this in the letter from Chairman Gill to President Katz, dated November 17, 1991.

In that letter, Chairman Gill stated that B & L was withdrawing its letter of October 23, 1987, "and will continue to purchase product from Sonomed in accordance with the minimum purchase requirements" of the distribution agreement. Further, the B & L firm purchase order for the fourth quarter of 1987 and the first quarter of 1988 was enclosed.

The November 17, 1987 letter from B & L which clearly and expressly waived any claim of default or breach of contract by Sonomed or right to self-manufacture, was rejected by Sonomed.

In a letter dated November 19, 1987 from Bernard Bressler, authorized by the Sonomed President and Board of Directors (Plf. Ex. 89), the contractual relationship between the parties based on the Distribution Agreement, was unequivocally terminated. The November 19, 1987 letter (Plf's Ex. 89) reads, in part, as follows:

"Dear Mr. Gill:

We have been asked to respond to your letter of November 17, 1987 to Mr. Louis Katz, President of Sonomed Technology, Inc. ("Sonomed").

\* \* \* \* \* \*

Based on the above, Sonomed wishes to advise you that your letter of November 17, 1987, purporting to agree to continue to purchase the minimum quantities of Sonomed's products under Section 3.02 of the Agreement, is not timely and cannot result in the continuation or restoration of the Agreement.

\* \* \* \* \* \*

Apart from these deficiencies, I personally advised your counsel, at my meeting with him and Mr. Steinbrenner in Rochester on November 16, that Sonomed's position was that Bausch & Lomb could no longer exercise a right to retract its repudiation of the Agreement, if it ever had such a right. The time for a retrac-

tion of a repudiation such as yours has passed. It ended at 1:00 P.M. on November 6, 1987, when you failed to respond to our November 3 letter.

\* \* \* \* \* \*

Sonomed knows that, in fact, the market for its products is much greater than what is reflected by Bausch & Lomb's sales to end users. Sonomed has the capacity and intention to satisfy that market and to hold Bausch & Lomb liable for its failure to do so. *We, therefore, advise you that Sonomed will pursue its lawsuit vigorously and will not accept any orders from Bausch & Lomb or deliver any goods under orders received and unfilled prior to your breach"* (emphasis supplied).

In apparently the final communication between the parties, in a letter dated November 25, 1987 (Plf's Ex. 97), Attorney Bressler rejected any attempt to relent and prophetically stated:

"Suffice it to say we believe you acted too late. Absent some ability to resolve our differences, a court will determine who is in the right."

## ADDITIONAL FINDINGS OF FACT

The Court makes the following additional findings of fact:

1. B & L and Sonomed entered into the distribution agreement at issue which was effective as of July 1, 1986 and was to terminate on December 31, 1989.

2. By the terms of the agreement, Sonomed appointed B & L to be its exclusive distributor for the ultrasound products throughout the "territory" consisting of "the fifty states of the United States, Puerto Rico and Canada.

3. Under the terms of the prior distribution agreement entered into on December 21, 1984 (Plf's Ex. 1), B & L paid to Sonomed the sum of $500,000 as a non-returnable "prepaid royalty." In the July 1, 1986 distribution agreement at issue, in Section 12.07, Sonomed acknowledged receipt of the $500,00 payment by B & L, which payment was similarly referred to as a non-returnable "prepaid royalty", and which

payment was made in consideration of B & L becoming the "exclusive" distributor in the designated territory.

4. By the terms of section 3.01 of the agreement, Sonomed was allowed a variance "of up to 15% on the actual quantity of ... B–Scans delivered to B & L from those quantities specified in each purchase order transmitted to Sonomed."

5. Prior to and on April 15, 1987, Sonomed was in default of the delivery provisions set forth in Section 3.01 of the agreement in that it failed to deliver to B & L 85% of the B–Scans specified on the purchase orders for the fourth quarter of 1986 and the first quarter of 1987.

6. The April 15, 1987 letter sent by David A. Souerwine of B & L to Louis Katz of Sonomed served as formal notice to Sonomed pursuant to Section 10.01 of the agreement of its failure to timely deliver the ordered B–Scans for the fourth quarter of 1986 and the first quarter of 1987.

7. By the terms of Section 10.01 of the agreement, Sonomed had a period of ninety days to cure the delivery default, or until approximately July 17, 1987.

8. Sonomed failed to cure its said delivery default within the said ninety-day period.

9. Subsequent to July 17, 1987, by the terms of Section 10.01 of the agreement, at the option of B & L, "Sonomed shall be deemed to have granted to B & L, as the sole remedy for such failure, (to timely deliver) a license to manufacture" the products at issue for sale in the territory, in which event B & L is obligated to pay Sonomed a royalty of 17.5% of Sonomed's prices to B & L for each product sold to an end-user customer.

10. In a letter dated October 23, 1987 from Alexander L. Russell, Jr. of B & L to Louis Katz of Sonomed, B & L notified Sonomed that it exercised its option under Section 10.01 of the agreement under which it could manufacture the A–Scan and B–Scan and components for sale in the United States, Puerto Rico and Canada for the duration of the agreement.

11. That by the said letter notice dated October 23, 1987, B & L effectively exercised its option to self-manufacture, pay royalties and continue the agreement, pursuant to Sections 10.01 and 10.02.

12. In a letter dated November 17, 1987 from Daniel E. Gill of B & L to Louis Katz of Sonomed, B & L withdrew its prior October 23, 1987 letter seeking to self-manufacture pursuant to Sections 10.01 and 10.02; stated that it will continue to purchase products from Sonomed in accordance with the requirements of Section 3.02 of the agreement; enclosed "firm purchase orders for the fourth quarter of 1987 and the first quarter of 1988," in addition to the 25 units still to be filled for the third quarter of 1987; and expressed the hope that the November 17th letter from the Chairman of B & L "will serve to re-establish a working relationship between Bausch & Lomb and Sonomed and that the remainder of the agreement can be ... performed by both of our companies to our mutual benefit."

13. Authorized by President Katz and the Sonomed Board of Directors, Attorney Bernard Bressler wrote a letter dated November 19, 1987 to Chairman Gill of B & L in response to the November 17, 1987 Gill letter. In his letter Attorney Bressler advised B & L that Sonomed "will not accept any orders from Bausch & Lomb or deliver any goods under orders received and unfilled prior to your breach." (See the Hellrung letter dated November 23, 1987 (Plf. Ex. 92) and the Bressler letter dated November 25, 1987 (Plf. Ex. 97).

14. Following the November 19, 1987 Bressler letter, the business relationship between the parties terminated in that Sonomed refused to accept any orders from B & L or deliver any products under prior orders.

15. By the terms of Section 2.01 of the distribution agreement, Sonomed approved B & L "to be its exclusive distributor for the Products, Parts and Accessories throughout the Territory." In Section 1.01 of the agreement, the Territory was defined as meaning "the United States, Puerto Rico and Canada."

16. Notwithstanding this clear and express exclusivity right in favor of B & L, the defendant Sonomed sold "Products" which were the subject of the agreement, namely A–Scans and B–Scans, in the defined territory during the terms of the agreement.

17. Prior to November 17, 1987 the plaintiff B & L did not consent to or even know about the sales by Sonomed to customers in the B & L territory.

## CONCLUSIONS OF LAW

1. *As to the Issue of the Alleged Repudiation or Anticipatory Breach by B & L.*

■ The July 1, 1986 agreement between the parties is for the sale of "goods", and is therefore governed by the New York Uniform Commercial Code (N.Y.U.C.C. § 2–102). The U.C.C. makes a clear distinction between a breach of a duty to render present performance and a repudiation of a duty to render performance not yet due (*see* 3. W. Hawkland, *Uniform Commercial Code Series* § 2–610:02, at p. 121 [1984]).

Here, Sonomed alleges that the October 23, 1987 letter by B & L, claiming its right to self-manufacture under the agreement, was a "repudiation" of the July 1, 1986 agreement.

New York U.C.C. § 2–610, provides as follows:

"§ 2–610. **Anticipatory Repudiation**

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach (Section 2–703 or Section 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article ..."

"Repudiation" or anticipatory breach occurs when there has been an "overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance" (N.Y.U.C.C. § 2–610, official comment 1; *see also Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F.Supp. 312, 316 [S.D.N.Y. 1989] ["There must be a clear demonstration of an intent not to perform when the time for performance arrives"]). "Repudiation can result from action which reasonably indicates a rejection of a continuing obligation" (N.Y.U.C.C. § 2–610, official comment 2).

 Section 2–610 of the U.C.C. is also consistent with existing New York common law (Practice Commentary to N.Y.U.C.C. § 2–610, at p. 536 [McKinney's 1964]). Under New York law, a disavowal of a contract, that is, an anticipatory repudiation, occurs whenever there is an overt communication of a "positive and unequivocal" intention not to perform (*Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 379 N.E.2d 1166, 408 N.Y.S.2d 36 [1978]; *Reprosystem, B.V. v. SCM Corp.*, 630 F.Supp. 1099, 1101 [S.D.N.Y.1986]). Once there has been a wrongful repudiation of the contract, such anticipatory breach "entitles the nonrepudiating party to immediately claim damages for a total breach.... [T]he doctrine relieves the nonrepudiating party of its obligation of future performance and entitles that party to recover the present value of its damages from the repudiating party's breach of the total contract" (*American List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 549 N.E.2d 1161, 1165, 550 N.Y.S.2d 590, 594 [1989]; *see also Gittlitz v. Lewis*, 28 Misc.2d 712, 212 N.Y.S.2d 219, 220 [Sup.Ct. Nassau County 1961] [Farley, J.] ["Although a party may treat an entire contract as abrogated and sue immediately where there has been an anticipatory breach, the facts warranting such a position must be fully and clearly established."]).

██ It is well settled under New York law that the party claiming anticipatory repudiation bears the burden of proof on the issue (*Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1275 [2d Cir.1989]; *Helmsley–Spear, Inc. v. Westdeutsche Landesbank*, 721 F.Supp. 43, 45–46 [S.D.N.Y.1989] [collecting cases]).

██ Here, the October 23, 1987 "self-manufacture" letter from B & L to Sonomed did not constitute a repudiation of the distribution agreement on the part of B & L. On the contrary, the Court finds that the October 23rd letter had a valid factual foundation and a basis in law and fact. Rather than a repudiation of the agreement, the October 23rd letter was an *affirmation* of B & L's rights under Section 10.01 of the agreement.

The position taken by B & L in the October 23, 1987 letter was not "a clear determination not to continue with performance" under the contract. Rather, B & L clearly and unequivocally stated its intention to continue to perform under the contract, except that it was exercising its right to self-manufacture as a result of Sonomed's earlier default with respect to the shortfall of the B–Scans. Since the Court finds that at the time of the October 23, 1987 letter Sonomed was in fact in default under the agreement and had not cured its default, there was no wrongful repudiation. Rather than an anticipatory breach, the October 23rd letter was in furtherance of the *continuation* of the agreement.

Stated simply, the October 23, 1987 letter was served in accordance with the express terms of the agreement and the sending of this letter did not constitute a repudiation or an anticipatory breach of the distribution agreement.

██ 2. The Court finds that despite the poor recordkeeping and the somewhat contradictory evidence adduced, the plaintiff B & L has not acted in bad faith.

The rule in contractual good faith was recently set forth in *Carvel Corp. v. Diversified Management Group Inc.*, 930 F.2d

228 (2d Cir.1991), a case involving a distributorship agreement, as follows:

"Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 684, 363 N.E.2d 573, 577, 394 N.Y.S.2d 867, 871 (1977); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 45, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329, 333, *cert. denied,* 409 U.S. 875 [93 S.Ct. 125, 34 L.Ed.2d 128] (1972); *see also* Restatement (Second) of Contracts § 205 (1981). This covenant includes 'an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.' *Grad v. Roberts,* 14 N.Y.2d 70, 75, 198 N.E.2d 26, 28, 248 N.Y.S.2d 633, 637 (1964)."

"Since the duty of good faith and fair dealing is implied in every contract, contracting parties' field of discretion under a contract are bounded by the parties' mutual obligation to act in good faith" (*Cross & Cross Properties Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 [2d Cir.1989]).

Accordingly, both parties are under a duty to perform the distribution agreement at issue in good faith. A failure to do so could be considered a material breach by either party.

In *Carvel,* the Second Circuit commented on acts which could constitute bad faith such as Carvel's rejection of proposed store locations and franchises, its refusal to allow changes in the blueprints, its refusal to accommodate to state health requirements and its abrupt and unexplained decisions to reverse wholesale sales and advertising policies.

In another illustrative case, *American Assurance Underwriters Group Inc. v. Metlife General Insurance,* 154 A.D.2d 206, 552 N.Y.S.2d 259 (1st Dep't 1990), it was held that making secret stock payments to the other contracting party eroded the duty of undivided loyalty to their employer. This improper course of conduct violated the implied covenant of fair dealing and good faith (*see also Black v. MTV*

*Networks,* 172 A.D.2d 8, 576 N.Y.S.2d 846 [1st Dep't 1991]).

On the other hand, the implied covenant of good faith "does not extend so far as to undermine a party's general right to act on its own interest in a way that may incidentally lessen the other party's anticipated profits from the contract" (*see M/A COM Security Corp. v. Galesi,* 904 F.2d 134 [2d Cir.1990]). In *M/A COM,* the plaintiff sought to advance its legitimate business interests in an unrelated transaction by lobbying efforts which prevented an advantageous merger which would have benefitted the defendant. This conduct was held not to be bad faith.

In this case, while the accounting procedures and records of the plaintiff were sloppy and inaccurate, I do not find that this negligent conduct rises to the level of "bad faith." I do not find that the April 15, 1987 letter was an attempt to intentionally or purposely end this agreement. I find that the B & L records that were available, did show a default by Sonomed. Further, as I have already stated, B & L had a contractual right to send the October 23, 1987 "self-manufacture" letter, and therefore, the sending of that communication did not constitute bad faith. It was only after an intense effort to review each purchase order and invoice and each piece of inventory that B & L finally realized it could not clearly determine whether there was a cure of the default by the defendant. This resulted in the November 17, 1987 waiver letter. Certainly, the sending of the waiver letter was not done in bad faith.

Accordingly, the Court finds that plaintiff B & L established, by a preponderance of the evidence, that its actions and conduct during the period at issue, in 1986 and 1987, did not violate the implied covenant of good faith and fair dealing with regard to the distribution agreement of July 1, 1986.

■ 3. The November 3, 1987 letter from Attorney Bressler to B & L (Plf's Ex. 66) which limited any response by B & L to November 6, 1987 at 1:00 p.m. was not in accordance with any notice provision con-

tained in the agreement. First, there was no breach by B & L which would give Sonomed the legal right to set such an ultimatum. Second, even if there was a material breach by B & L, the notice provision, as set forth in Section 8.02 is a thirty-day period, rather than the forty-eight hours provided in the November 3rd letter.

4. The November 17, 1987 letter from B & L to Sonomed (Plf's Ex. 86) was an express waiver of any prior breach by Sonomed both with regard to the failure to make timely delivery of ordered units and with regard to the quality of the B–Scans.

5. The November 17, 1987 letter from B & L to Sonomed effectively waived any rights on the part of B & L to self-manufacture pursuant to sections 10.01 and 10.02 of the agreement and reaffirmed the distribution agreement by the terms of which Sonomed was the manufacturer and seller and B & L was the exclusive distributor within the "territory."

6. The November 19, 1987 letter from Bressler to B & L (Plf's Ex. 89) in which Sonomed expressly stated that it "will not accept any order from Bausch and Lomb or deliver any good under orders received and unfilled," which action was uncured, constituted a material breach of the distributorship agreement on the part of Sonomed.

7. The sales by Sonomed of products covered by the distribution agreement within the territory in which B & L was granted an exclusive distributorship, constituted a material breach of the said agreement on the part of Sonomed.

8. There was no material breach of any portion of the distributorship agreement on the part of the plaintiff B & L.

9. The defendant Sonomed failed to establish, by a preponderance of the credible evidence, that the October 23, 1987 letter constituted a repudiation of the agreement by B & L.

10. The defendant Sonomed failed to establish, by a preponderance of the evidence, that there was an anticipatory breach of the agreement by B & L.

11. The plaintiff B & L has established, by a preponderance of the credible evidence, that the defendant Sonomed breached the distribution agreement at issue, in that on November 19, 1987 and thereafter, it refused to accept any orders from B & L and refused to deliver any products to B & L under prior, present or future orders.

12. The plaintiff B & L has established, by a preponderance of the credible evidence, that the defendant Sonomed breached the distribution agreement at issue, in that it sold products covered by the agreement within the exclusive territory of B & L.

13. The defendant Sonomed failed to establish, by a preponderance of the credible evidence, that the plaintiff B & L breached the distribution agreement, in any manner.

14. The defendant Sonomed failed to establish, by clear and convincing evidence, that there was any fraud perpetrated by the plaintiff B & L.

15. The defendant Sonomed failed to adduce any evidence of fraudulent inducement of the contract to support the second counterclaim. The Court therefore finds that the defendants failed to pursue, or abandoned, this counterclaim.

16. The Court previously dismissed the plaintiff's first claim against the defendants based on antitrust violations (see the reasons stated by the Court at Tr. pp. 1636–1646).

Accordingly, having found an actionable breach of contract by the defendant Sonomed against the plaintiff B & L, the Court now turns to the claims of damages asserted by the plaintiff.

### AS TO DAMAGES

The purpose of damages in a breach of contract case is to compensate the injured party for the loss caused by the breach (5 *Corbin on Contracts* § 1002, at p. 31 [1964]). The damages in a breach of contract action are generally measured by the plaintiff's actual loss (*see Restatement (Second) of Contracts* § 347 [1981]).

The object of the law in affording damages in a breach of contract action

is to compensate or indemnify the injured party so as to put it in as good a position as it would have been had the defendant abided by the agreement (*see Western Geophysical Co. of Am. v. Bolt Assocs., Inc.,* 584 F.2d 1164, 1172 [2d Cir.1978]; 11 *Williston on Contracts* § 1338, at p. 198 [3d ed. 1968]; *see also* J. Calamari & J. Perillo, *Contracts* § 14–4, at p. 591 [3d ed. 1987]; N.Y.U.C.C. § 1–106). The injured party is entitled to compensation for the loss sustained as a result of the breach, and is to be placed, so far as money can do it, in the position it would have been in if the contract had been performed (*see* 3 *Farnsworth on Contracts* § 12.8 [1990]; *see also Menzel v. List,* 24 N.Y.2d 91, 246 N.E.2d 742, 298 N.Y.S.2d 979 [1969] [New York follows "expectation" theory of recovery in breach of contract action] )." The injured party may recover the gains prevented as well as the losses sustained, but generally not the gain realized by the defendant (*see Orange & Rockland Utilities Inc. v. New England Petroleum Corp.,* 60 A.D.2d 233, 400 N.Y.S.2d 79 [1st Dep't 1977]; *see also* 36 N.Y.Jur.2d *Damages* § 32).

■ Another statement of the rule is that the measure of damages for breach of contract is the value of the contract to the injured party if the other party to the contract had performed as agreed; which means the "value" of the contract including the profits and other advantages which are the direct result of a completed contract, or a sum equal to the benefits which would have resulted from the proper performance of the contract (*Spitz v. Lesser,* 302 N.Y. 490 99 N.E.2d 540 [1951]; 36 N.Y.Jur.2d, *Damages* § 32).

■ The general rule that in an action to recover damages for breach of contract the injured party is entitled to recover all of its damages, including gains prevented as well as losses sustained, is always subject to three limiting conditions: (1) that the injured party cannot recover damages for a loss that could have reasonably been avoided if that party had taken appropriate steps to do so; (2) that the damages must be reasonably within the contemplation of the parties at the time the contract was made; and (3) the damages must be reasonably definite and certain (3 *Farnsworth on Contracts* § 12.8, at pp. 188–89 [1990] ).

Initially, the Court will discuss Sonomed's contention that B & L cannot sustain any damages because it assigned away its rights to Cambridge.

In opposition, B & L responds that it does have a justiciable claim; that defendant has cited no authority for its proposition that an assignee cannot sue; and that there is in fact support for the opposite proposition, namely, that a party can sue on behalf of its assignor. B & L alleges that in fact, it is the "assignee" of Cambridge's suit, since Cambridge assigned back to B & L the right to prosecute the action and recover any costs incurred in so doing.

■ Rule 17(a) of the Federal Rules of Civil Procedure provides that "[e]very action shall be prosecuted in the name of the real party in interest." The effect of Rule 17(a) is that the action must be brought by the person who is entitled to enforce the right (*see Hercules Inc. v. Dynamic Export Corp.,* 71 F.R.D. 101, 105 [S.D.N.Y. 1976]; *see generally* 3A *Moore's Federal Practice* ¶ 17.07 [2d ed. 1991] [construing real party in interest] ).

"Standing" requirements, in terms of "constitutional" and "prudential" considerations, are wholly distinct concepts, not to be confused with the "real party interest" analysis (*see* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3531 ["At times courts are tempted to draw from standing decisions in addressing such matters as ... identification of the real party in interest"]; *see also id.* at § 1542 ["it is not surprising that courts and attorneys frequently have confused the requirements for standing with those used in connection with real party in interest or capacity principles"] ).

Standing considerations, as urged by the defendants, typically arise in the context of challenges to governmental conduct in the public realm (*see, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S.

464, 102 S.Ct. 752, 70 L.Ed.2d 700 [1982] [challenge to decision by HEW]; *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 [1976] [challenge to IRS grant of favorable tax status to hospital]), and do not typically arise in the purely commercial setting between private parties. In fact, this Court has been unable to locate any decision directly on point in the context of an assignment to and assignment back.

Despite the defendants' attempts to distinguish the Ninth Circuit case of *Klamath–Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276 (9th Cir.1983), this Court finds it persuasive and directly applicable here.

In *Klamath–Lake*, a pharmaceutical association to which individual pharmacies belonged, maintained an antitrust action against a health care provider that offered prescription drug benefits that were available only at the provider's pharmacy. The individual pharmacies assigned their claims to the association, but, as in this case, they retained their rights to receive any benefits of the litigation. Using the "real party in interest" analysis under Rule 17(a), the Ninth Circuit stated that "[a]n assignment of claims does not prevent the assignors from receiving the benefits of the litigation", and held that the association was the real party in interest under Rule 17(a) and could properly maintain the action (701 F.2d at p. 1282 [citation omitted]).

■ This case does not involve ∴ challenge to governmental conduct, but rather is a commercial dispute between private parties arising out of an arm's length transaction. The assignment of the claims in this case to Cambridge, and back again to B & L, does not divest B & L of its "personal stake" in the litigation. Under the assignment, B & L had the express right to prosecute this action and is entitled to reimbursement for all costs incurred in prosecuting the action. Even though Cambridge retains the right to receive any other benefits of the litigation, B & L is nevertheless considered the "real party in interest" under Rule 17(a) (*see Klamath–Lake, supra*, 701 F.2d at p. 1282).

Accordingly, the defendants' argument that B & L lacks standing is rejected.

With these general rules in mind, the Court will now review the damage claims interposed by B & L. In Plaintiff's Exhibit 148, B & L claimed the following items of damage in the contract causes of action (the second and third claims).

1. Return of the $500,000 paid by B & L to Sonomed pursuant to Section 12.07 of the Agreement for exclusive distribution rights which rights were the reason that B & L entered into this agreement ..................... $500,000

2. Return of the $55,000 paid by B & L to Sonomed which was required to be returned pursuant to Section 3.04 of the Agreement........... $55,000

3. All proceeds of sales of products to customers other than B & L by Sonomed in the United States, Canada and Puerto Rico during the period from July 1, 1986 to December 24, 1987 ..... $379,974

4. The profits which B & L should have received on sales of the products by Sonomed from December 24, 1987 to December 31, 1989, the chronological termination of the agreement, but which were unjustly received by Sonomed after its repudiation of the Agreement......... $786,319

5. The loss of value of B & L's inventory sold to Cambridge which inventory Cambridge later sold back to Sonomed at reduced prices...... $1,080,377

6. Punitive damages .:...... $5,000,000

7. Appropriate interest.

The Court will discuss these items in seriatim.

1. *As to the Return of the $500,000 Payment.*

■ As stated above, the measure of damages on a breach of contract action is to compensate the injured party for the actual loss of the contemplated gain to be obtained under the terms of the agreement. Under the facts in this case, this involves

an alternative measure of damages. In the event the Court were to award damages to B & L for the loss of prospective anticipated profits for the term of this agreement, there could be no return of the $500,000 payment made for the exclusive rights. This payment by B & L of $500,000 was made in order to obtain the exclusive distributorship for the ultrasound products in the designated territory. If B & L is compensated for the loss of its profits, it cannot receive back its investment, since it would not have otherwise received back the return of the $500,000. This was recognized by counsel for the plaintiff in his summation (Tr. at p. 2345).

However, if the Court, for whatever reason, declines to award damages to B & L for its prospective loss of profits; then the Court must determine whether a return of the $500,000 payment would be a fair, reasonable and certain alternative measure of damages.

Section 12.07 of the agreement states that:

"Sonomed acknowledges receipt of the payment of $500,000 by B & L under the prior agreement, as a prepaid royalty. Such amount constitutes a prepaid royalty, and under no circumstances is refundable to B & L in part or in whole. *In the event of any dispute with respect to this Agreement, such payment shall be deemed to be payment for exclusive distribution rights*" (emphasis supplied).

By express terms, the parties agreed that the $500,000 would be treated as a "prepaid royalty" and also agreed that it should be "deemed to be payment for exclusive distribution rights." Certainly, as stated above, this payment could not be recovered in addition to any claim for loss of profits. That would be awarding the plaintiff more than the loss of the bargain. The plaintiff is only entitled to be made whole.

■ However, in the absence of any claim or allowance for loss of profits and if there is a breach of the exclusive distribution rights, as there was in this case, it would be appropriate for the Court to return the $500,000 to B & L. Although the

express language of the agreement seems to prohibit the return of this sum, the Court notes that "in the event of any dispute with respect to this agreement, such payment shall be deemed to be payment for exclusive distribution rights." Since Sonomed has repeatedly violated the exclusive distribution provision, which is the heart of the agreement insofar as B & L is concerned, it would be, under such circumstances, within the reasonable contemplation of the parties to envision a return of the payment. This would place the parties back in the same position as they were prior to the agreement.

2. *Return of the Down Payment of $55,-000.*

■ The rule limiting the recovery of general compensatory damages for breach of contract to the sum necessary to make the injured party "whole", which sum is fairly and reasonably within the contemplation of the parties at the time of the making of the contract does not preclude the recovery of what we call *special* damages, which may arise under the circumstances peculiar to the particular case. Such special damages are recoverable "only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made" (*American List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 549 N.E.2d 1161, 1164, 550 N.Y.S.2d 590, 593 [1989]).

■ Stated simply, if specific reference is made in the contract to special damages and such damages are not a penalty, they are recoverable (*see generally* 36 N.Y.Jur. 2d, *Damages* § 40).

■ In this regard, Section 3.04 of the distribution agreement provides as follows:
"*Section 3.04.* Upon the execution of this Agreement by both parties, B & L shall promptly remit to Sonomed a down payment equal to $27,184.37. This shall be in addition to the amount of $27,-815.63 presently held by Sonomed as a down payment pursuant to the Prior Agreement. *Upon the termination of this Agreement, Sonomed shall imme-*

*diately refund to B & L the total amount of $55,000 being held by Sonomed as a down payment"* (emphasis supplied).

This "down payment", which was paid in addition to the $500,000 "prepaid royalty" is, by the express terms of the agreement, payable by Sonomed "upon the termination of the agreement." If the agreement had not been breached by Sonomed and continued until December 31, 1989, its chronological end, B & L would have earned profits on the sales of the products within the exclusive territory and, in addition, at the end of the contractual term, would have also been entitled to the return of the $55,-000.

Accordingly, the said sum of $55,000 is awarded to B & L as an agreed-upon "special damage."

3. *As to sales of "products" to customers by Sonomed in the United States, Canada and Puerto Rico during the period from July 1, 1986 to December 24, 1987.*

 The Court has made a finding that the defendant Sonomed breached the exclusive distributorship provision of the agreement by surreptitiously selling the products within the proscribed "territory." However, the Court finds that the damages to B & L resulting from this breach are uncertain. The discussion of lost profits is relevant for the period of from July 1, 1986 to December 24, 1987, the effective end of the agreement, as well as for the subsequent period of December 24, 1987 to the acknowledged end of the contract on December 31, 1989.

The New York law on the issue of loss of prospective profits, as an element of damages in a breach of contract action is well-settled and was clearly enunciated by the New York Court of Appeals in the seminal contract damage case of *Kenford Co. Inc. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986), as follows:

"Loss of future profits as damages for breach of contract have been permitted in New York under long-established and precise rules of law. First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. *In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain* and directly traceable to the breach, not remote or the result of other intervening causes (*Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 4 N.E. 264). In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made (*Witherbee v. Meyer*, 155 N.Y. 446, 50 N.E. 58). If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty (*Cramer v. Grand Rapids Show Case Co.*, 223 N.Y. 63, 119 N.E. 227; 25 C.J.S. Damages, § 42[b])" (emphasis supplied).

This same rule has been adopted by the Second Circuit, as recently as September 5, 1991, in *Care Travel Co. v. Pan American World Airways*, 944 F.2d 983 (2d Cir.1991).

In this case, there is no doubt that if loss of profits by B & L could be sufficiently established, they would have been caused by the defendant's breaches. Fatal to the plaintiff's claim for such lost profits in this case, however, is a failure to prove the past or potential or prospective loss with a reasonable degree of certainty. In *Kenford, supra*, the issue of speculative loss of profits was clearly delineated:

"Next, we note that despite the massive quantity of expert proof submitted by DSI, the ultimate conclusions are still projections, and as employed in the present day commercial world, subject to adjustment and modification. We of course recognize that any projection cannot be absolute, nor is there any such requirement, but it is axiomatic that the degree of certainty is dependent upon

known or unknown factors which form the basis of the ultimate conclusion. Here, the foundations upon which the economic model was created undermine the certainty of the projections.

\* \* \* \* \* \*

Quite simply, the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty.

The economic facts of life, the whim of the general public and the fickle nature of popular support for professional athletic endeavors must be given great weight in attempting to ascertain damages 20 years in the future."

(See also Hirsch Electric Co., Inc. v. Community Services, Inc., 133 A.D.2d 140, 518 N.Y.S.2d 818 [2d Dept 1987] [While loss of profits may be awarded as damages in an action to recover damages for breach of contract, damages must be shown to be the natural and probable consequence of the breach complained of and must be based on more than mere speculation [see, Wakeman v. W. & W. Man, Co., 101 N.Y. 205, 4 N.E. 264]]).

Critical to the determination of the Court in this case is the decision in Spielvogel v. Zitofsky, —— A.D.2d ——, 573 N.Y.S.2d 198 (2d Dep't 1991), which contains particularly appropriate language with regard to damages for lost profits in this case, as follows:

"The Supreme Court determined that, by violating a covenant not to compete, the appellant had caused the plaintiffs to lose profits in the sum of $433,500. This determination is based on evidence that during the period of its competition with the plaintiffs, the appellant's business generated $690,000 from the sale of vertical blinds. The plaintiff Anthony Vitale testified that, in the vertical blind business, 35 percent of the sales price consisted of the cost of "raw material \* \* \* excluding overhead." We note that the record is unclear as to the other costs of doing business apart from the cost of raw materials. In any event, the court reduced the sum of $690,000 (representing the appellant's gross sales) so as to arrive at the sum of $433,500 as the appellant's net profit.

In awarding to the plaintiffs a sum of money allegedly representing all of the profit made by the appellant during the time of his improper competition, the Supreme Court necessarily found that "the plaintiff[s] would have made all the sales actually made by the [appellant] if the [appellant] had not competed with [them]" (Michel Cosmetics v. Tsirkas, 282 N.Y. 195, 204 [26 N.E.2d 16]). However, there is no evidence in the record which tends to support this finding. The evidence does not furnish an adequate basis upon which to determine to what extent, if at all, the plaintiff's business, whose sales continued to increase during the years in question, would have increased even further had the appellant not been in competition."

The Court finds that the plaintiff has failed to establish, by a preponderance of the evidence, that all the proceeds of sales of products to customers by Sonomed within the exclusive territory from July 1, 1986 to December 24, 1987, would be the fair measure of damages to B & L. As in Spielvogel, supra, there is no evidence in the record that B & L would have made all or even any of these sales if Sonomed was not competing with it. Further, there is insufficient evidence of what the net profit to B & L would be if B & L rather than Sonomed had made the sales. This is especially true in view of B & L's difficulties in selling the product necessitating substantial price reductions. To award damages to B & L for the proceeds of sales by Sonomed would be totally speculative and may unjustly reward the plaintiff rather than make it "whole".

Accordingly, the Court declines to award to B & L "the proceeds of sales of products to customers ... by Sonomed in the United States, Canada and Puerto Rico during the period from July 1, 1986 to December 24, 1987."

4. *As to the alleged loss of future profits by B & L consisting of sums "unjustly received" by Sonomed in sales from December 24, 1987 to December 31, 1989.*

The Court refers to the discussion in the prior item of alleged damages, regarding loss of profits as damages and the necessity for such proof to be reasonably certain and not merely speculative or possible, as being applicable to this item as well.

At the outset, the Court notes that, surprisingly, B & L has made no claim for its own prospective loss of profits. In Plaintiff's Exhibit 148, at item 4, the plaintiff apparently seeks the profits based on the sales made by Sonomed during the period December 24, 1987 to December 31, 1989. Also, in Plaintiff's Exhibit 150, the plaintiff claims as its profits, "the excess profits earned by Sonomed in selling at prices above those at which it would have sold to B & L." The plaintiff further states that "Sonomed would be unjustly enriched ... were it to retain those excess profits." In Plaintiff's Exhibit 150, B & L sets forth the sales made by Sonomed during the period between December 24, 1987 and December 31, 1987, and during the years 1988 and 1989.

For the reasons stated above in the Court's discussion of the third item of damages claimed by the plaintiff, the Court finds that the plaintiff has failed to establish that sales by Sonomed furnish fair and reasonable proof of B & L's loss of profits. The Court adopts the rule set forth in *Spielvogel, supra,* in that there is no evidence that B & L would have made all or any of the sales actually made by Sonomed. In *United States Naval Institute v. Charter Communications, Inc.,* 936 F.2d 692 (2d Cir.1991), the rule as to the breaching party's profits was set forth, as follows:

"While on occasion the defendant's profits are used as the measure of damages, *see, e.g., Cincinnati Siemens–Lungren Gas Illuminating Co. v. Wester Siemens–Lungren Co.,* 152 U.S. 200, 204–07 [14 S.Ct. 523, 525–26, 38 L.Ed. 411] (1894); *Murphy v. Lifschitz,* 183 Misc. 575, 577, 49 N.Y.S.2d 439, 441 (Sup.Ct. N.Y. County 1944), *aff'd mem.,* 268 A.D. 1027, 52 N.Y.S.2d 943 (1st Dep't), *aff'd mem.,* 294 N.Y. 892, 63 N.E.2d 26 (1945), this generally occurs when those profits tend to define the plaintiff's loss, for an award of the defendant's profits where they greatly exceed the plaintiff's loss and there has been no tortious conduct on the part of the defendant would to be punitive, and punitive awards are not part of the law of contract damages."

There is no finding of any tortious action by the defendant in this case. There is no proof that B & L would have made the same sales and there is no proof of the net profit to Sonomed. Nor is there any claim as to B & L's profit.

Further, even if B & L did interpose a claim for loss of its own prospective net profit, certainly a more common measure of damages, such a claim would be wholly speculative. The Court would have to hypothesize that B & L would meet the threshold number of minimum orders and sales in order to retain exclusivity in this new business venture. The Court would further have to speculate on the selling prices to distributors and end users. This is a particularly uncertain measure in this case in view of the proven facts that, during 1987 B & L was having difficulty selling the products; that it was involved in "aggressive marketing techniques"; it was engaged in a massive crash sales operation; and that it was discounting its price by as much as forty percent.

Thus, the Court finds that the plaintiff B & L failed to establish that the Sonomed sales proceeds during the period December 24, 1987 to December 31, 1989 were a reasonably certain measure of the loss of profits of B & L during that period.

In sum, we have a situation here where there has been clearly established two separate breaches of the distribution agreement by the defendant Sonomed. These breaches of contract have caused some damage to the plaintiff B & L. (See for example Sonomed's admission that it owes at least $10,000 to $15,000 as a result of its sales in the exclusive territory.) However, the plaintiff has failed to establish the

amount of damages for its loss of profits or because of competitive sales made by Sonomed by reason of the speculative nature of this evidence.

However, there is a measure of damage for the breach of the exclusive distributorship, capable of proof with reasonable certainty. The Court refers to the $500,000 initial payment made by the plaintiff B & L. As stated above, the sole reason for this substantial payment by B & L to Sonomed was for the right to become the exclusive distributor for the Sonomed ultrasound products in the designated "territory." While Section 12.07 of the agreement states that this payment, "under no circumstances is refundable to B & L in part or in whole," it also states the crucial language, that "such payment shall be deemed to be payment for exclusive distribution rights."

In the Court's role to interpret this agreement, it is clear that the only consideration underlying B & L's payment of the sum of $500,000 was to receive the exclusive distributorship. By defendant's breach it took back this exclusive distributorship and improperly secured this valuable right for itself.

The law of contract damages is intended to compensate the injured party for the loss of the bargain; it is intended to make the injured party "whole." If the defendant Sonomed received $500,000 for exclusive distribution rights and, by its breach it vitiated those rights, in fairness and in accordance with the law of contract damages, the defendant Sonomed should return the $500,000. The contracting parties must have reasonably contemplated, at the time the contract was made, that if B & L received no exclusivity, it would be entitled to the return of its $500,000. By so doing the plaintiff B & L will be reasonably compensated and fairly made "whole."

Another rule of damages is applicable in this regard. Where the aggrieved party, namely B & L, cannot establish its loss of profits with sufficient certainty, as in this case, it is permitted to recover foreseeable expenses incurred in reliance upon the contract (J. Calamari & J. Perillo, *Contracts, supra,* § 14–9). The allowance of such recovery for "reliance" expenditures is an alternative theory of recovery where the "expectation" theory is incapable of yielding a reasonably certain award based on future profits (*see id.*).

5. *As to the loss of the value of the inventory resulting from the sale of the ultrasound inventory from Cambridge to Sonomed in 1988.*

By agreement dated December 9, 1987 (Plf's Ex. 106), B & L sold to Cambridge its Optical System Division and its diagnostic ophthalmic instruments business, including the assignment of thirty-one existing contracts. One of these assigned contracts was the distribution agreement between Sonomed and B & L, dated July 1, 1986. The price paid to B & L for this acquisition was the sum of $37,000,000.00. Under the agreements affecting this sale, the Sonomed contract was assigned to Cambridge who purchased the inventory and assumed all the rights and obligations under the distribution agreement. Simultaneously, Cambridge reassigned to B & L its claims against Sonomed for breach of the agreement. Accordingly, by the terms of the Cambridge sale agreement, B & L was compensated for the inventory it sold to Cambridge.

Thereafter, by written agreement dated July 29, 1988 (Plf's Ex. 125), Cambridge sold the remaining inventory in its possession back to Sonomed for a price of $345,014.

The Court finds that the plaintiff B & L has failed to establish that the damages caused by the allegedly reduced price of the inventory, when resold by Cambridge to Sonomed, was within the contemplation of the parties when the distribution agreement was entered into on July 1, 1986. Further, the Court finds that the plaintiff has failed to establish that the products were in a substantially similar condition at the times purchased and subsequently sold. In this regard, the Court notes that the proof established that certain of the units were "cannibalized" by B & L and subse-

quently by Cambridge as well (*see* Plf's Ex. 151).

Accordingly, B & L's claim for loss of the value of the inventory by the sale from Cambridge to Sonomed in 1988, is denied.

### 6. As to the B & L Claim for Punitive Damages.

 This is an "ordinary" or "simple" breach of contract action, bereft of even the complication of proof of fraud. The rule as to punitive damages in this kind of contract action was set forth by Judge Kearse in *Smith v. Lightning Bolt Productions*, 861 F.2d 363 (2d Cir.1988), as follows:

"Under the law of New York, which governs in this diversity action, punitive damages are not available for a simple breach of contract, *see, e.g., Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795 (1976); *Bader's Residence for Adults v. Telecom Equipment Corp.*, 90 A.D.2d 764, 455 N.Y.S.2d 303 (2d Dep't 1982); or for the 'ordinary' case of fraud, *e.g., Gale v. Kessler*, 93 A.D.2d 744, 745, 461 N.Y.S.2d 295, 296 (1st Dep't 1983); *Oehlhof v. Solomon*, 73 A.D. 329, 334, 76 N.Y.S. 716, 720 (1st Dep't 1902). The availability of such an award is reserved for cases in which the defendant's conduct has constituted 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree. *Borkowski v. Borkowski*, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287 (1976). The requisite degree of culpability may be found in cases where, for example, the fraud on the plaintiff was 'not an isolated transaction incident to an otherwise legitimate business, but [was rather] a gross and wanton fraud upon the public,' *Walker v. Sheldon*, 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 492, 179 N.E.2d 497, 499 (1961); or where there has been 'such a gross disregard of ... contractual obligations as to constitute morally culpable conduct,' *Hubbell v. Trans World Life Insurance Co.*, 50 N.Y.2d 899, 901, 430 N.Y.S.2d 589, 590, 408 N.E.2d 918, 919 (1980). In addition, without explicitly relying on the concept of a wrong done to the public, state courts have found pleadings adequate to state a claim for punitive damages where 'the wrong involves some violation of duty springing from a relation of trust or confidence,' *Oehlhof v. Solomon*, 73 A.D. at 334, 76 N.Y.S. at 720 (dictum); or where an attorney 'abused his professional status by repeated fraudulent representations to plaintiff [a creditor of his client] to its detriment and for his own personal gain' and assisted in placing collateral beyond the reach of the plaintiff, *Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 209, 212, 411 N.Y.S.2d 66, 67–68, 69 (4th Dep't 1978); or where an attorney abused his professional status and breached his duty of trust and confidence by making repeated misrepresentations to his client, *Green v. Leibowitz*, 118 A.D.2d 756, 758, 500 N.Y.S.2d 146, 149 (2d Dep't 1986)."

Accordingly, since there is no proof in this case of "gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree," the plaintiff B & L's claim for punitive damages is dismissed.

### 7. As to Appropriate Interest.

Under New York law, which the agreement provided was to control, a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter or right (*see* N.Y.C.P.L.R. §§ 5001, 5002 [McKinney's 1963]; *United States Naval Instit. v. Charter Communications, Inc.*, 936 F.2d 692 [2d Cir.1991]; *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 484–85 [2d Cir.1983]; *Lee v. Joseph E. Seagram & Sons, Inc.*, 592 F.2d 39, 41 [2d Cir.1979]).

Having concluded that B & L is entitled to recover damages for breach of contract, the Court awards prejudgment interest to B & L on the damages recovered, namely, the sum of $555,000.00 from December 24, 1987.

### FINAL CONCLUSIONS

The plaintiff B & L is awarded a judgment against the defendant on its second

claim in the complaint in the total sum of $555,000.00, together with interest from December 24, 1987.

The first and third "claims" in the complaint are dismissed.

The first, second and third counterclaims by Sonomed are dismissed.

The Clerk is directed to enter final judgment accordingly.

SO ORDERED.